# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
#### 5:13-cv-149-RLV
#### (5:09-cr-25-RLV-DCK-1)

| | | |
|---|---|---|
| ALEJANDRO SALINAS GARCIA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1).

## I. BACKGROUND

**A. Petitioner is the primary supplier in a large-scale drug trafficking organization,
importing hundreds of kilograms of cocaine, pounds of methamphetamine, and
thousands of pounds of marijuana from south Texas into western North Carolina.**

Petitioner was the primary target of an investigation led by the U.S. Department of Homeland

Security into a large-scale drug trafficking organization, responsible for transporting cocaine,

methamphetamine, and marijuana from south Texas to cities located throughout western North

Carolina. (Crim. Case No. 5:09-cr-25-RLV-DCK-1, Doc. No. 194 at 5: PSR). Law enforcement

identified Petitioner as one of the primary suppliers, regularly providing other members of the

organization with large quantities of marijuana and cocaine from 2005 until his arrest in

Brownsville, Texas on September 9, 2009. (Id. at 5-6).

During the course of the conspiracy, Petitioner employed several other individuals to assist him in his drug trafficking activities, paying them hundreds, and in some cases thousands, of dollars a week.  (Id. at 8-15).  Many of these individuals ultimately cooperated with law enforcement, discussing Petitioner's role as one of the primary suppliers.  (Id.).  Petitioner's associates confirmed that he was responsible for trafficking hundreds of kilograms of powder cocaine.  (Id.).  The cooperating coconspirators also explained that Petitioner and other members of the organization possessed firearms and engaged in armed robberies of other drug dealers.  (Id. at 7-8; 13-14).  In addition to the interviews, law enforcement also confirmed Petitioner's drug activities through authorized wiretap interceptions and physical surveillance.  (Id. at 5; 12-13).

Shortly after his arrest, Petitioner retained Attorney David Freedman to represent him and subsequently participated in two debrief sessions with the Government.  See (Id., Doc. No. 31: Notice of Appearance; Doc. Nos. 220-1, 220-2: Supp. Response Exs. 1-2).  During the interviews, Petitioner admitted that he had been involved in dealing drugs and trafficking narcotics since 2003.  (Id., Doc. No. 194 at 6).  By his own admission, Petitioner was personally involved in trafficking thousands of pounds of marijuana and dozens of kilograms of cocaine during the course of the conspiracy.  (Id. at 7-8).  In addition to the cocaine and marijuana, Petitioner also regularly supplied pounds of methamphetamine to others.  (Id. at 8).

**B. Under a written plea agreement, Petitioner pleads guilty to the drug conspiracy charge.**

On December 15, 2009, the grand jury for the Western District of North Carolina charged Petitioner, along with three coconspirators, in a second superseding indictment with conspiracy

to possess with intent to distribute at least five kilograms of cocaine, at least fifty kilograms of crack cocaine, and at least 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(b)(1)(A), 846. (Id., Doc. No. 64 at 1: Second Superseding Indictment). Shortly thereafter, Petitioner entered into a plea agreement, in which he agreed to plead guilty to the drug conspiracy count. (Id., Doc. No. 93: Plea Agreement). In the plea agreement, Petitioner acknowledged that he faced not less than ten years, nor more than life, in prison for his conviction. (Id. at 1).[1] With respect to the guidelines, the parties agreed that more than five kilograms of cocaine was known to or reasonably foreseeable by Petitioner, while reserving the right to argue about the specific amount over five kilograms. (Id. at 2-3). The parties also agreed that Petitioner's plea was timely and that, provided he made a timely disclosure of his criminal activity, he would be entitled to a total reduction of three levels for acceptance of responsibility. (Id. at 3). Petitioner acknowledged that, by pleading guilty, he was "expressly waiving" the right to "be tried by a jury." (Id. at 5).

With respect to cooperation, Petitioner agreed to provide truthful information to the Government about the charges, as well as any other criminal activity within his knowledge. (Id. at 6-7). In exchange, the Government agreed, with several exceptions, that it would not use Petitioner's disclosures against him. (Id. at 7). Among the exceptions, the agreement explained that if Petitioner withdrew or attempted to withdraw his guilty plea, the Government could use

---

[1] Petitioner also agreed that, in light of a notice of a prior felony conviction, he faced a mandatory sentence of not less than twenty years, nor more than life in prison. (Id. at 2). Because the prior conviction used to trigger the enhanced sentence did not qualify as a felony under United States v. Simmons, 635 F.3d 140 (4th Cir. 2011), the lower statutory range ultimately applied.

any and all disclosures against him in any subsequent trial.  (Id. at 8).  Petitioner also agreed that

the Government, "in its sole discretion, [would] determine whether [his] assistance [was]

substantial" and that if it determined that Petitioner had provided substantial assistance the

Government "may make a motion . . . for a reduction in the defendant's term of imprisonment."

(Id.).

   In exchange for the Government's concessions, Petitioner agreed to waive the right to

appeal or collaterally attack his conviction and sentence, except for claims of ineffective

assistance of counsel or prosecutorial misconduct.  (Id. at 6).  Finally, Petitioner agreed that "if

[he] breach[ed] th[e] Plea Agreement, including by attempting to withdraw the guilty plea, . . .

the United States [would] be relieved of its obligations under th[e] Plea Agreement, but [he]

[would] not be allowed to withdraw [his] guilty plea."  (Id. at 9).

   On February 11, 2009, consistent with the written plea agreement, Petitioner pled guilty

before U.S. Magistrate Judge David C. Keesler in a hearing conducted pursuant to Rule 11 of the

Federal Rules of Criminal Procedure.  (Id., Doc. No. 94: Entry & Acceptance of Guilty Plea).

After confirming that Petitioner's "mind [was] clear" and that he "underst[ood] [he was there] to

enter a guilty plea that [could] not later be withdrawn," the magistrate judge placed Petitioner

under oath and confirmed that he understood the nature of the charge, as well as the minimum

and maximum penalties associated with that charge.  (Id. at 1-3).  Petitioner then admitted that he

was, in fact, guilty of the drug conspiracy offense.  (Id. at 3).  Petitioner acknowledged his

understanding that by pleading guilty he was waiving the right to a jury trial.  (Id.).  With respect

to the guidelines and possible sentence, Petitioner affirmed that he understood he could receive a

sentence different than that called for by the guidelines and that he would still be bound by his

plea if the sentence was more severe than he expected or if the sentencing court did not accept the Government's recommendation.  (Id. at 2).

After the Government summarized key terms of Petitioner's plea agreement, Petitioner acknowledged that he understood and agreed with the terms of the agreement, including the waiver of his right to appeal or collaterally attack his conviction.  (Id. at 4).  At the conclusion of the hearing, Petitioner affirmed that he had enough time to discuss possible defenses with Attorney Freedman and that he was satisfied with Attorney Freedman's services.  (Id.).  Based on Petitioner's representations and answers during the hearing, the magistrate judge found Petitioner's plea to be knowingly and voluntarily made and accepted it.  (Id. at 5).

**C. Petitioner fires Attorney Freedman and three subsequent lawyers and moves to withdraw his guilty plea.**

In preparation for sentencing, the probation officer prepared a presentence investigation report, calculating an advisory guidelines range of 360 months to life in prison based on a total offense level of 41 and a criminal history category of III.  (Id., Doc. No. 194 at 28).  Before sentencing, on March 24, 2011, the Government filed a motion for downward departure, pursuant to guidelines § 5K1.1, to reflect Petitioner's substantial assistance.  (Id., Doc. No. 176: Motion).  In the motion, the Government recommended a five-level downward departure to a total offense level of 36, which, when coupled with Petitioner's criminal history category of III, would result in a guidelines range of 235 to 293 months in prison.  (Id. at 3).  At the conclusion of the motion, the Government recommended a sentence of 240 months in prison.  (Id.).

Shortly after the Government filed its motion for downward departure, Petitioner filed a pro se motion to dismiss Attorney Freedman, contending that Attorney Freedman was not

responsive to his requests. (<u>Id.</u>, Doc. No. 181: Motion). Likewise, Attorney Freedman filed a motion to withdraw consistent with Petitioner's instructions. (<u>Id.</u>, Doc. No. 182: Motion). This Court subsequently granted Attorney Freedman's motion to withdraw. After conducting a series of inquiries into status of counsel hearings, the magistrate judge appointed Attorney John Clark Fischer to represent Petitioner. (<u>Id.</u>, Doc. No. 190). Following his appointment, Attorney Fischer moved to continue sentencing, notifying this Court that he was uncertain whether Petitioner wanted his representation. (<u>Id.</u>, Doc. No. 193: Motion). Attorney Fischer subsequently withdrew on December 3, 2011, explaining that Petitioner had retained Attorney Emmanuel West. (<u>Id.</u>, Doc. No. 199: Motion).

On May 7, 2012, this Court presided over a sentencing hearing at which Attorney West appeared on Petitioner's behalf. (<u>Id.</u>, Doc. No. 224-1: Sent'g Hrg. I). At the outset of the hearing, Petitioner complained about the representation he received from his prior lawyers and stated that Attorney West was also being unresponsive to his requests. (<u>Id.</u> at 2-3). After conferring with counsel, Petitioner made an oral motion to withdraw his guilty plea. (<u>Id.</u> at 7). Petitioner explained that his objection was to the presentence report, stating "I won't accept that PSI." (<u>Id.</u> at 9). Petitioner continued, "[I]t's not that I want to go to trial or keep on delaying this case, but I can't just, you know, accept what's [in the PSR]." (<u>Id.</u>). According to Petitioner, Attorney Freedman and the other lawyers who subsequently represented him would not "make the right objections." (<u>Id.</u>).

During the exchange, Petitioner also referenced a potential conflict of interest based on Attorney Freedman's prior representation of a "co-defendant of [Garcia's]," "Victor Hernandez Davila." (<u>Id.</u> at 12-13). Petitioner stated, "I don't know if I ever would have had the chance to

go to trial if I wanted to because [Attorney Freedman's] representing somebody that's going against me." (Id. at 13). When asked if he was aware of any conflict, Attorney West said that he had not heard anything until that day, when Petitioner "pointed it out to [Attorney West] . . . that that might be a possible conflict." (Id.). During the exchange, this Court reviewed Petitioner's statements during the Rule 11 hearing, including his statement that he understood the charges and statutory penalties, that he was aware of how the sentencing guidelines operated, that he was satisfied with the services of his attorney, that he understood all parts of the plea hearing and still wanted to plead guilty, that he had not been made any promises with respect to the sentence, and that he understood he had the right to decide whether to go to trial. (Id. at 10-12; 16; 19-20). Attorney West stated that he was "against [Garcia] withdrawing his plea" but nevertheless clarified that Petitioner's claim was that Attorney Freedman misadvised him during the plea process and that he therefore did not understand the consequences of his actions. (Id. at 14-17).

At the end of the discussion, Petitioner explained his position regarding the motion to withdraw as follows: "[W]hat I really wanted to do was just redo the PSI. I really didn't want to go back on the plea; but since that can't be done, I see no other way to do it. That's what I want to do, just get a couple of things straightened out on this PSI because that's what this court goes by . . . ." (Id. at 21). When this Court asked Petitioner whether he was claiming that he was innocent, Petitioner responded that he was "not able to answer that question right now." (Id.). The Court ultimately continued the sentencing hearing to allow Petitioner time to clarify his position. (Id. at 22).

On May 22, 2012, just weeks after the first sentencing hearing, Petitioner supplemented his motion to withdraw his guilty plea in a pro se letter to the Court. (Id., Doc. No. 219 at 1:

Letter).  In the letter, Petitioner stated that he made a "mistake" in accepting a "bad plea deal." (Id. at 1).  Petitioner complained that Attorney Freedman "used scare tactic[s]" to convince him to plead guilty by advising him that "if [he] did not sign [he] would be facing a life sentence." (Id.).  According to Petitioner, Attorney Freedman initially told him that he was "looking at about 5 years."  (Id.).  Petitioner also alleged that Attorney Freedman had a "conflict of interest" because he represented a codefendant, "Victor Hernandez Davila," who was mentioned in the presentence report.  (Id.).  Petitioner also complained that he had not heard from Attorney West and that all of his attorneys had been unresponsive to his requests.  (Id. at 2).

In response to the motion to withdraw, the Government maintained that Petitioner had not demonstrated a "fair and just" reason to withdraw his guilty plea, explaining that Petitioner's sworn statements during the Rule 11 hearing and in his plea agreement confirmed that the plea was knowing and voluntary.  (Id., Doc. No. 217 at 6-7: Response).  The Government also summarized the wealth of evidence against Petitioner, including his own detailed admissions to trafficking multiple kilograms of cocaine and thousands of pounds of marijuana between 2003 and 2009.  (Id., Doc. No. 220 at 1-2: Supp. Response).  Finally, citing Petitioner's statements at the first sentencing hearing held on May 7, 2012, the Government asserted that Petitioner had not claimed innocence or requested a trial in connection with his motion to withdraw, but he was, instead, upset because he "expected a lower sentence."  (Id., Doc. No. 224: Second Supp. Response).

This Court attempted to conduct Petitioner's sentencing hearing for the second time on June 5, 2012.  (Id., Doc. No. 243: Sent'g Hrg. II).  At the outset of the hearing, however, Attorney West moved to withdraw, citing irreconcilable differences with Petitioner.  (Id. at 2-6).

After hearing from Attorney West and Petitioner, this Court granted Attorney West's motion to withdraw and continued the hearing to resolve the issue of counsel before a ruling on Petitioner's motion to withdraw his guilty plea. (Id. at 6). After Petitioner failed to follow through on his claim that he was going to retain a lawyer to replace Attorney West, this Court appointed Attorney Scott Gsell to represent Petitioner following a pair of inquiry into status of counsel hearings before the magistrate judge. See (Id., Doc. No. 227: Order). Shortly thereafter, Petitioner began having problems with Attorney Gsell as well, and, consequently, the magistrate judge conducted another inquiry into status of counsel hearing. See (Id., Doc. No. 233). At the hearing held on July 17, 2012, Petitioner refused court-appointed counsel, declined to retain counsel, and indicated he did not wish to represent himself, pursuing what the magistrate judge characterized as "'Moorish' theories regarding the Court's jurisdiction." (Id. at 4).

In response to Petitioner's conduct, Government counsel suggested a competency examination, pursuant to 18 U.S.C. § 4241, which Attorney Gsell opposed, explaining that Petitioner's "adherence to unusual legal theories" did not mean that he was incompetent and that Petitioner appeared "intellectually capable and articulate." (Id., Doc. No. 227 at 4-5). Following the status of counsel hearing, the magistrate judge issued an order, ruling that Attorney Gsell would continue to represent Petitioner and denying the motion for a competency hearing based on Attorney Gsell's statements about Petitioner's conduct and competency, as well as the magistrate judge's own observations of Petitioner at the various hearings. (Id.).

Before sentencing, Attorney Gsell moved to withdraw, explaining that Petitioner refused the services of counsel and instructed counsel not to speak on his behalf at the upcoming sentencing hearing. (Id., Doc. No. 241). This Court took up the issue of counsel at its third

attempt at a sentencing hearing on September 10, 2012.  (Id., Doc. No. 252: Sent'g Hrg. III).  At

the hearing, Petitioner repeated that he did not want court-appointed counsel, did not wish to

proceed pro se, and would not hire his own lawyer.  (Id. at 4-5).  In response, this Court observed

that Petitioner had been represented to that point by five "excellent" attorneys and had rejected

them all.  (Id. at 6).  Based on Petitioner's refusal of counsel, this Court advised him as if he

were proceeding pro se.  (Id. at 6-16).  Throughout the exchange, Petitioner referred to himself as

the "occupant of the executor office of Alejandro Garcia Salinas estate" and questioned the

Court's authority and jurisdiction.  (Id. at 2-20).  At the conclusion of the "colloquy," this Court

found that Petitioner had knowingly and voluntarily waived his right to counsel and would

represent himself.  (Id. at 16).  Over Petitioner's objection, this Court ordered Attorney Gsell to

remain in the case as standby counsel.  (Id. at 16-17).

> **D. This Court denies Petitioner's motion to withdraw his guilty plea and sentences him to life in prison.**

On December 5, 2012, this Court presided over Petitioner's sentencing hearing.  (Id.,

Doc. No. 272: Sent'g Hrg. IV).  At the outset of the hearing, this Court addressed Petitioner's

motion to withdraw his guilty plea.  (Id. at 7).  The Court explained that it had reviewed the

parties' submissions, as well as the transcript of Petitioner's plea hearing.  (Id. at 9-12).  Based

on its review, the Court found that Petitioner failed to present evidence, "credible or otherwise,"

to show that his plea was not knowing and voluntary; that Petitioner had not asserted his

innocence but instead had made numerous admissions regarding the conduct that formed the

basis for the drug conspiracy charge; that there was a "substantial delay" between the entry of the

plea and filing of the motion to withdraw that was largely the result of Petitioner's "dilatory"

tactics; that Petitioner had the "close assistance of counsel" before rejecting their representation; that the passage of time would "undoubtedly" prejudice the Government; and that any prejudice to the Court was not a serious factor. (Id. at 12-15). In light of its findings with respect to the relevant factors, this Court denied Petitioner's motion to withdraw his guilty plea. (Id. at 15).

After denying the motion to withdraw, this Court proceeded with Petitioner's sentencing. (Id. at 16). After receiving evidence and argument, this Court overruled Petitioner's objections to the presentence report. (Id. at 43-44). This Court also granted the Government's motion to withdraw its motion for downward departure and ruled that Petitioner was not eligible for the three levels off for acceptance of responsibility, finding that he was "not accepting any responsibility for [his] crime." (Id. at 46-47). Accordingly, this Court calculated a guidelines range of life, based on a total offense level of 43 and criminal history category of III. (Id. at 47). After hearing from both sides, this Court sentenced Petitioner to life in prison. (Id. at 56). This Court entered judgment on December 7, 2012, and Petitioner did not appeal. (Id., Doc. No. 260: Judgment).

### E. Petitioner files a motion to vacate, in which he alleges, among other things, that Attorney Freedman failed to notify him of a potential conflict.

On November 1, 2013, Petitioner timely filed the instant motion to vacate, claiming (1) that he received ineffective assistance from Attorney Freedman with respect to his guilty plea, because Attorney Freedman failed to disclose an actual conflict based on his prior representation of Victor Hernandez; (2) that the Fair Sentencing Act should apply to his case; (3) that this Court erred in denying his motion to withdraw his guilty plea by failing to consider all of the relevant factors; (4) that this Court erred by failing to order a competency hearing based on Petitioner's

behavior, and (5) that the Government breached the plea agreement by failing to move for a downward departure based on Petitioner's cooperation. More than six months later, on June 30, 2014, Petitioner filed an affidavit in support of his motion, amending his claim related to Attorney Freedman's alleged conflict of interest. (Doc. No. 3: Declaration/Affidavit of Alejandro Garcia). The crux of Petitioner's conflict of interest claim is that Attorney Freedman also represented Victor Hernandez, a co-conspirator and co-defendant of Petitioner, and that Hernandez gave information to the Government that was used to inculpate Petitioner in the conspiracy. Despite having argued in his initial motion to vacate that Attorney Freedman represented both him and Hernandez "without disclosing that representation" at all, (Doc. No. 1 at 7-8), Petitioner acknowledged in his affidavit that he, in fact, knew of Attorney Freedman's prior representation, having recommended Attorney Freedman to Hernandez, (Doc. No. 3 at 1-2). Petitioner nevertheless claimed that, although he was aware of the prior representation, Attorney Freedman had failed to "make [Petitioner] aware that that [Hernandez] had provided any type of information against [Petitioner] whatsoever." (Id. at 3). Consequently, Petitioner claimed that he "never knew" that Hernandez "had cooperated and wrote statements against [him]" until he received the presentence report. (Doc. No. 3 at 3).

In addition, Petitioner provided affidavits from his brother and sister related to their interactions with Attorney Freedman. (Doc. No. 6: Aff. of Lucia Garcia; Doc. No. 7: Aff. of Miguel Garcia, Jr.). Petitioner's sister, Lucia Garcia, stated that she met with Attorney Freedman on one occasion to provide payment to Attorney Freedman and that she was "unaware of Mr. Freedman ever informing [her] family or [her] brother that he could not or would not represent him at trial." (Doc. No. 6 at 1-2). Similarly, Petitioner's brother, Miguel Garcia, Jr.,

stated that, at Petitioner's request, he contacted Attorney Freedman, who initially was "very attentive and helpful." (Doc. No. 7 at 1). Petitioner's brother also stated that "[a]t no time did Mr. Freedman ever inform [his family] or [his] brother that he also represented a man by the name of Victor who, as it turns out, would testify against [his] brother to help his own criminal case," and that "[a]t no time did Mr. Freedman ever inform [his] family or [his] brother that he could not or would not represent him at trial." (Id. at 1-2).

In connection with the Government's response, Attorney Freedman provided an affidavit responding to Petitioner's allegations. (Doc. No. 10-1: Aff. of David Freedman). In the affidavit, Attorney Freedman acknowledged that he previously represented Victor Hernandez, explaining that Petitioner had, in fact, retained him to represent Hernandez. (Id. at 1). As Attorney Freedman explained, during the course of his representation of Hernandez, Hernandez "decided to cooperate, and provided information on a number of people who were involved in drug transactions . . . including [Petitioner.]" (Id.). Attorney Freedman next heard from Petitioner through his family when he was indicted on drug charges. (Id.). Contrary to Petitioner's allegation, Attorney Freedman stated that he explained the nature of the conflict related to his prior representation of Hernandez, including the limitation on the ability to represent Petitioner at trial, to both Petitioner and his family, explaining that he "informed [Petitioner's] family that if Mr. Garcia wanted to go to trial I would have a conflict in this matter. However, if Mr. Garcia wished to plead and cooperate then I would be able to represent him" and that he also informed Petitioner that "[he] could not represent [Petitioner] in a trial because [he] had represented Mr. Hernandez." (Id.). Attorney Freedman explained that, after he informed Petitioner about the nature of the conflict, Petitioner "informed [him], under no

circumstances, did he wish to go to trial." (Id.). Attorney Freedman noted that he advised Petitioner that a trial was not "in his best interest" because, according to Attorney Freedman's guidelines calculation, Petitioner would be facing life in prison. (Id.).

In his affidavit, after summarizing his conversation with Petitioner regarding the potential conflict and Petitioner's knowing waiver, Attorney Freedman explained his efforts in getting Petitioner the opportunity to cooperate and states that, as a result of those efforts, Petitioner had the opportunity to debrief with the Government and subsequently "laid out the full extent of his involvement." (Id.). Attorney Freedman went on to explain his interactions with Petitioner during the plea process through the end of his representation. (Id.). According to Attorney Freedman, Petitioner "was unhappy" with the Government's downward departure recommendation from a guidelines range of "30 years to life" down to "20 years." (Id. at 2). Attorney Freedman stated that, in subsequent meetings, Petitioner "became increasingly irrational" and that the meetings became "increasingly short." (Id.). Attorney Freedman explained that he ultimately moved to withdraw at Petitioner's request. (Id.).

In its response to the motion to vacate, the Government stated that an evidentiary hearing was appropriate to consider whether Petitioner could demonstrate (1) that there was an actual conflict because Attorney Freedman failed to disclose how his prior representation of Hernandez could have impacted his subsequent representation of Petitioner and (2) that the alleged conflict adversely affected Attorney Freedman's representation by leading him to coerce Petitioner into a plea agreement while forgoing the alternative strategy of proceeding to trial. On April 27, 2015, this Court ordered an evidentiary hearing on the "sole issue" of whether "Freedman had a conflict of interest that adversely affected his representation of Petitioner." (Doc. 14 at 2).

**F. Testimony Presented at the June 3, 2015, Evidentiary Hearing.**

This Court held an evidentiary hearing on June 3, 2015, on Petitioner's conflict of interest claim. Attorney Freedman, Petitioner, Petitioner's brother and sister, and Department of Homeland Security Special Agent Joseph Barringer all testified at the hearing. The Court makes the following findings of fact based on testimony and exhibits submitted at the evidentiary hearing on Petitioner's conflict of interest claim:

At the hearing, Attorney Freedman's testimony mirrored what he stated in his affidavit—that is, Freedman testified that he told Petitioner's family that "if [Petitioner] wanted to go to trial, that [he] would not be able to represent him because he [Freedman] would have a conflict." (Doc. No. 18-1 at 10). Freedman testified that he specifically did not set his fee at the amount it would have been had he represented Petitioner through trial. Rather, he "set an initial $1,500 fee that would allow [Freedman] to drive to Charlotte, interview [Petitioner], make sure [Petitioner] wanted me to represent him and inform him that I could only represent him if he . . . wanted to cooperate and not go to trial. And . . . he agreed he wanted to do that . . . ." (Id. at 11). Freedman testified that "I knew from the amounts that [the Government was] talking about he was facing, I believe I told him if he went to trial, he could be getting a life sentence." (Id. at 15). Freedman testified that "I told him the same thing I told everyone else. He's facing a lot of time. The U.S. Attorney's office does a very thorough job. He was the prime target in this case. I felt if he went to trial and lost, he would be facing a life sentence and he needed to give serious thought. And he informed me that he did not want to go to trial. He wanted to cooperate. Which is why we . . . which is why we set up a debriefing within two days afterward." (Id. at 15-16).

Freedman also testified that "I would say that we never had a serious discussion about going to trial.  And as you can see from how quickly the debriefing occurred between when I saw him, . . . this was the best route for [Petitioner]."  (<u>Id.</u> at 22).  Freedman stated that if Petitioner had indicated that he wanted to go to trial, Freedman "would have counseled him against it saying he was on the right track.  That he was cooperating.  That I believe he was going to get a motion pursuant to 5K1.1.  And that trial would have been a very bad task.  But if he would have insisted upon going to trial, I would have found other counsel for him."  (<u>Id.</u> at 35-36).  Freedman further testified that "I told [Petitioner] all along that he was facing ten to life.  Then when we got—you know, they filed an enhancement so I told him it was 20 to life."  (<u>Id.</u> at 33).  Freedman testified that Petitioner wanted Freedman to negotiate "with the government a 5-year sentence out of the 30-year sentence," but "that went south and then we went south."  (<u>Id.</u> at 38-39).  Freedman explained that "about the time when I could not get for him the variance below the statutory minimum of 20 years, he became suspect of the government and became suspect of me as well."  (<u>Id.</u> at 39).  As to the conflict of interest, Freedman testified that "I know I told him I had a conflict.  I know he knew that I had represented [Hernandez].  And I told him I could not proceed with him [Petitioner] at trial."  (<u>Id.</u> at 17).

Petitioner's brother Miguel Garcia, Jr., also testified at the evidentiary hearing.  Garcia, Jr., testified that Freedman never told Garcia, Jr., that if Petitioner wanted to go to trial he [Freedman] could not represent Petitioner, or that Freedman had a conflict of interest.  (<u>Id.</u> at 48-49).  Petitioner's sister Lucia Garcia also testified at the evidentiary hearing.  (<u>Id.</u> at 57).  She testified that she did not recall Freedman ever telling her that he had a conflict in representing Petitioner.  (<u>Id.</u>).

Petitioner also testified at the evidentiary hearing. At the hearing, on direct examination, Petitioner admitted that he referred Victor Hernandez to Freedman for representation, and that he knew that Freedman was representing Hernandez when he [Petitioner] retained Freedman for his own defense. (Id. at 62; 84-85). Petitioner testified that when Freedman first met with him, Freedman told Petitioner that he "was looking at 40 something years; and based on his experience, it would just be the way to go, to take a plea. And I mean, when he told me 40 something years, it was . . . I took it as a scare tactic." (Id. at 67). Later in his testimony, however, Petitioner testified that he made his initial decision not to go to trial and to plead guilty instead because "Mr. Freedman almost assured me that I could get five years." (Id. at 73-74).

When asked if Freedman ever advised him that he may have a conflict representing Petitioner because of his prior representation of Hernandez, Petitioner answered, "No, sir." (Id. at 69). When asked if Freedman ever told Petitioner that Freedman could not represent Petitioner if Petitioner chose to go to trial because of Freedman's previous representation of Hernandez, Petitioner answered that Freedman "[n]ever told me that." (Id.). Petitioner testified that he did not know that Hernandez had given the Government information that was used against Petitioner until Petitioner first saw the PSR. (Id. at 70). Petitioner also testified that he would not have hired Freedman to represent him if he had known that Hernandez had cooperated against Petitioner. (Id. at 75). On cross-examination, Petitioner admitted that he acknowledged at his Rule 11 hearing on May 7, 2012, that he knew that Freedman was representing one of Petitioner's co-defendants, referring to Hernandez. (Id. at 80-81).

Finally, Department of Homeland Security Special Agent Joe Barringer also testified at the evidentiary hearing. (Id. at 92). Agent Barringer testified that, following his arrest,

Petitioner participated in an interview with Barringer and that Freedman was at the interview representing Petitioner. (Id. at 95). Agent Barringer testified Petitioner gave Barringer and other agents at the interview "a fairly lengthy statement regarding his involvement in the smuggling and distribution of cocaine here within the Western District." (Id. at 96). Barringer further testified that

> [o]f particular interest, prior to that interviewing—or prior to that interview beginning, [Petitioner's] defense counsel at the time, who, again, was David Freedman, told [Petitioner] in front of me and the others that there was a potential conflict of interest because . . . [Petitioner] had paid Mr. Freedman to represent Victor Hernandez, I believe, who was a co—or had the potential to be a co-defendant. And because of that, he informed the defendant that if it was his intent to do anything other than plead guilty and cooperate, that he would not be able to represent him.

(Id. at 96). Agent Barringer then testified that, following Freedman's statement, Petitioner moved forward with the interview, providing "detailed information regarding his involvement and the involvement of others." (Id. at 96-97).

## II.     STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. A petitioner collaterally attacking his or her conviction bears the burden of proving that the conviction imposed violated the United States Constitution or laws, that the court lacked jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. The petitioner has the burden of proving the grounds for the collateral attack by a preponderance of the evidence. Vanater v. Boles, 377 F.2d 898, 900 (4th Cir. 1967); White v.

18

United States, 352 F. Supp. 2d 684, 686 (E.D. Va. 2004). In a § 2255 proceeding, a court may hold an evidentiary hearing to "determine the issues and make findings of fact and conclusions of law." 28 U.S.C. § 2255(b). When making findings of fact, the court should determine the credibility of witnesses and reliability of other evidence. See United States v. Roane, 378 F.3d 382, 393-94, 409 n.15 (4th Cir. 2004).

## III. DISCUSSION

**A. Petitioner's claim that Attorney Freedman was ineffective for failing to disclose, or at least failing to explain the significance of, his prior representation of Petitioner's co-defendant Victor Hernandez, who provided information to the Government that inculpated Petitioner.**

Petitioner first contends that Attorney David Freedman rendered ineffective assistance of counsel during the plea negotiations because he had a conflict of interest. Specifically, Petitioner contends that Freedman was ineffective for failing to disclose, or at least failing to explain the significance of, his prior representation of Victor Hernandez, a co-defendant of Petitioner who subsequently provided information to the Government about Petitioner.

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir.

2010).  Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'"  Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong."  United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

To establish that an attorney was ineffective because he was operating under a conflict of interest, a petitioner must show "that (1) petitioner's lawyer operated under a 'conflict of interest' and (2) such conflict 'adversely affected his lawyer's performance.'"  United States v. Nicholson, 611 F.3d 191, 195 n.2 (4th Cir. 2010) (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)).  If a petitioner is able to satisfy both prongs required to support a conflict of interest claim, "no prejudice need be shown because the conflict of interest is assumed to be harmful." United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991).  With respect to the first prong, the petitioner must show "[m]ore than a mere possibility of a conflict."  Id.  (emphasis in original). Instead, the petitioner must prove that his attorney had an "actual conflict," which the Fourth Circuit has defined as occurring when the attorney "actively represents conflicting interests."  Id. To establish an actual conflict, the petitioner "must show that [his] interests 'diverge[d] [from his attorney's] with respect to a material factual or legal issue or to a course of action.'"  Stephens v. Branker, 570 F.3d 198, 209 (4th Cir. 2009) (quoting Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir. 1998) (en banc) (alterations in original)).

As for the second prong, the petitioner must show, by a preponderance of the evidence, that the actual conflict adversely affected the attorney's performance.  Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001) (en banc).  To make this showing, the petitioner must (i) "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued"; (ii) "show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision"—in other words, "that the alternative tactic or strategy was 'clearly suggested by the circumstances'"; and (3) "establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict."  Id. (quoting Tatum, 9743 F.2d at 376).  As the Fourth Circuit has recognized, the determination of whether an actual conflict had an adverse effect is "largely factual."  Id. at 362 (affirming, under a clear error standard, the district court's findings in support of its determination that a claimed conflict did not have an adverse effect on the attorney's representation).

The Court finds that, in light of the evidence presented in the parties' briefs and at the evidentiary hearing, Petitioner fails to show that he received ineffective assistance of counsel based on a conflict of interest by Attorney Freedman.  First, Petitioner has not shown an actual conflict of interest—that is, Petitioner has failed to show that his interests diverged from counsel's with respect to any matters in his proceedings as a result of the fact that Attorney Freedman had also represented Hernandez.  Here, it is undisputed that, as Freedman acknowledged, his prior representation of Hernandez presented a potential conflict of interest should Petitioner have wanted to go to trial because Freedman could not cross examine his former client.  No actual conflict of interest ever arose, however, because Petitioner knew that

Freedman represented Hernandez, Freedman explained the potential impact of the prior representation, and, with that knowledge and understanding, Petitioner decided to retain Freedman to negotiate a plea and cooperation agreement on his behalf rather than proceed to trial.

A review of the record and evidence presented at the evidentiary hearing confirms Freedman's testimony that there was no actual conflict because Petitioner intended to cooperate and plead guilty from the outset. As an initial matter, despite the misimpression Petitioner created in his original motion to vacate, the evidence presented at the evidentiary hearing clearly shows that Petitioner knew about Freedman's prior representation of Hernandez when Petitioner hired Freedman. Petitioner admitted at the hearing that he referred Hernandez to Freedman and paid part of the fee. The evidence not only confirms that Petitioner was aware of the prior representation, but it also shows that Petitioner understood the significance of that representation. Freedman testified credibly that he disclosed the potential conflict and advised Petitioner that he could only represent Petitioner if Petitioner intended to plead guilty.

Freedman's testimony is consistent with the other evidence presented at the evidentiary hearing, including Freedman's charging of an initial consultation fee, contrary to his ordinary practice, to discuss Petitioner's intentions with him in light of the potential conflict. Moreover, although Freedman testified that he "believe[d]" he had discussed the nature of the potential conflict but could not specifically recall the specifics of the conversation, Special Agent Barringer's testimony about Petitioner's first debrief credibly confirms that Freedman disclosed the prior representation of Hernandez and explained the significance of that representation before Petitioner's debrief.

Freedman and Barringer's testimony at the evidentiary hearing credibly establishes that Petitioner was fully informed about his options and knew of the potential conflict. Thus, Petitioner made an informed decision when he retained Freedman to negotiate a plea with the government on his behalf. Because Petitioner knowingly and voluntarily elected to proceed with his cooperation and plea with an understanding of the significance of Freedman's prior representation of Hernandez, there was no actual conflict of interest in this case.

Petitioner's self-serving testimony that he was unaware of the potential conflict and only pled guilty because Freedman threatened him and promised him a lenient, five-year prison sentence is simply not credible. Freedman's advice that Petitioner was facing as much as forty years in prison based on the charges was not a threat, as Petitioner characterizes it, but instead, represented a realistic prediction of Petitioner's potential sentence, which, as calculated in the presentence report, was initially 360 months to life in prison. Based on the allegations, which included a mandatory minimum sentence, and the strength of the evidence, Petitioner's claim that Freedman "almost assured" him that he would receive a five-year sentence is also incredible. See (Doc. No. 18-1 at 74).

Not only does Petitioner's testimony that he was threatened by Freedman lack credibility when considered against the other evidence, but Petitioner has also proven not to be credible earlier in these proceedings. In his initial motion to vacate, Petitioner alleged that "[A]ttorney Freedman represented both he and Victor Hernandez in criminal cases before this court without disclosing that representation." (Doc. No. 1 at 7). Petitioner's allegation contradicted statements he made during the criminal proceedings conclusively demonstrating that he was, in fact, aware of the prior representation. Indeed, as noted, Petitioner specifically referred Hernandez to

Freedman for representation and Petitioner paid part of the fee. Moreover, despite the misimpression created by his initial motion, Petitioner admitted during the evidentiary hearing that he was aware of the prior representation and that he and Freedman discussed Hernandez in the initial meeting. When confronted with the inconsistency during cross-examination, Petitioner attempted to explain that what he wrote in the sworn motion was not what he meant. (Doc. No. 18-1 at 86-87: Evidentiary Hr'g Tr.).

The evidence shows that, far from threatening Petitioner or making unrealistic promises, Freedman offered an accurate assessment of Petitioner's potential sentence, advised him of the benefits of cooperation, arranged for Petitioner to provide a debrief pursuant to a non-attribution agreement, and helped him secure a one-third downward departure from the low end of the guidelines based on his cooperation. As Petitioner acknowledged on cross-examination at his evidentiary hearing, the withdrawal of the Government's motion for downward departure and the resulting life sentence were not caused by any ineffective assistance or conflicted representation provided by Freedman but, instead, resulted from his manipulation of his choice of counsel and misguided legal tactics. (Doc. No. 18-1 at 89-90).

The Court further finds that, even assuming that Petitioner could show an actual conflict of interest, his claim nevertheless fails because he is unable to establish that any such conflict adversely affected the representation. To show that an actual conflict had an adverse effect, Petitioner must show that Freedman failed to pursue a plausible alternative strategy that was objectively reasonable and clearly suggested by the circumstances of the case. Here, Petitioner indicated early on that he wanted to plead guilty and cooperate, and he persisted in that strategy throughout, including during the proceedings related to the instant motion. Petitioner admitted

his criminal conduct and attempted to cooperate in debriefs with the Government just weeks after his arrest in Texas and only a matter of days after appearing in this district. Petitioner confirmed his clear intent to plead guilty shortly thereafter in his plea agreement and on the record at the plea hearing, where he affirmed that he was knowingly waiving his right to trial and wanted to plead guilty. Even when Petitioner later moved to withdraw his guilty plea, he did not contend he was factually innocent, nor did he request a trial. Instead, Petitioner took issue with the presentence report and the government's recommendation, explicitly stating that he did not want to go to trial. See (Crim. Case No. 5:09-cr-25-RLV-DCK-1, Doc. No. 224-1 at 9). Given Petitioner's persistent commitment to pleading guilty, there is no reasonable alternative strategy that Freedman failed to pursue under the circumstances of this case.

Petitioner's filings and testimony in connection with the instant motion further reinforce that his intention is not, and never was, to go to trial. Notably, in the supplemental briefing Petitioner submitted following the evidentiary hearing, he does not seek to vacate his plea and proceed to trial. Rather, he asks this Court to vacate his sentence so that he can "be resentenced anew." (Doc. No. 17 at 9: Supp. Memo.). On this record, where Petitioner's intent to plead guilty and forgo his right to trial has been clear from the outset, Petitioner is unable to show, as he must, that Freedman failed to pursue an alternative strategy that was objectively reasonable or clearly suggested by the facts and circumstances of this case or that the failure to pursue any such strategy was linked to the alleged actual conflict. As Petitioner acknowledges, his sentence is not the product of the representation provided by Freedman, who negotiated a favorable plea agreement on Petitioner's behalf, but instead is the result of his own misguided tactics and refusal to accept responsibility. In sum, Petitioner's ineffective assistance of counsel claim

based on an alleged conflict of interest is without merit.

**B. Petitioner's claim that he is entitled to relief under the retroactive amendments to the crack cocaine guidelines.**

In his next claim, Petitioner contends that he is entitled to relief under the retroactive amendments to the crack cocaine guidelines. In response to the Fair Sentencing Act of 2010, the United States Sentencing Commission passed Amendment 750, retroactively amending the crack cocaine guidelines. A claim seeking application of a retroactive guidelines amendment is properly presented in a motion for modification of a term of imprisonment under 18 U.S.C. § 3582(c)(1)(B), not in a § 2255 motion. In any event, Petitioner's guidelines in this case were calculated based on quantities of powder cocaine, not crack cocaine. Thus, even if a § 2255 motion to vacate were the appropriate vehicle for raising such a claim, which it is not, Petitioner's challenge to the calculation of his guidelines range is without merit.

**C. Petitioner's claim that this Court erred by denying Petitioner's motion to withdraw his guilty plea.**

In his next claim, Petitioner challenges this Court's denial of his motion to withdraw his guilty plea. As noted, Petitioner did not appeal his conviction. Under the procedural default doctrine, to pursue a claim in a motion to vacate that could have been but was not pursued on direct appeal, a petitioner must show cause and actual prejudice or that he is actually innocent of the crime. United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999). As the Supreme Court has recognized, "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review." Bousley v. United States, 523 U.S. 614, 621 (1998). As such, a petitioner who did not challenge the validity of his plea on appeal

but later seeks to do so in a § 2255 motion has procedurally defaulted his claim.  Because Petitioner has not demonstrated, or even alleged, cause or actual prejudice to excuse his failure to pursue his claim on direct appeal and because he does not maintain that he is actually innocent of the charge, his challenge is procedurally defaulted.

The Court further finds that, even if Petitioner's claim were not procedurally defaulted, it is nevertheless without merit.  A defendant does not have an absolute right to withdraw a guilty plea after the court has accepted it.  United States v. Nicholson, 676 F.3d 376, 383-84 (4th Cir. 2012).  Instead, a defendant must demonstrate "a fair and just reason for requesting the withdrawal."  Id. (quoting FED. R. CRIM. P. 11(d)(2)(B)).  When a district court considers a withdrawal request, the "most important consideration . . . is an evaluation of the Rule 11 plea colloquy at which the guilty plea was accepted."  United States v. Bowman, 348 F.3d 408, 414 (4th Cir. 2003).  A properly conducted Rule 11 hearing "raise[s] a strong presumption that the plea is final and binding," and "leaves a defendant with a very limited basis upon which to have his plea withdrawn."  Id. (internal quotations omitted).

In United States v. Moore, 931 F.2d 245 (4th Cir. 1991), this Court articulated the following list of factors to aid district courts in exercising their discretion to determine whether a fair and just reason exists:

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary; (2) whether the defendant has credibly asserted his legal innocence; (3) whether there has been a delay between the entering of the plea and the filing of the motion [to withdraw the plea]; (4) whether [the] defendant has had close assistance of competent counsel; (5) whether withdrawal will cause prejudice to the government; and (6) whether it will inconvenience the court and waste judicial resources.

Id. at 248.  Of the six Moore factors, this Court has explained that whether the plea was knowing

and voluntary is the most essential. United States v. Faris, 388 F.3d 452, 456 (4th Cir. 2004). In support of his challenge to this Court's ruling on his motion to withdraw his guilty plea, Petitioner contends, without elaboration, that this Court did not "properly" address the Moore factors in support of its ruling and that he "carried his burden with respect to at least four of the factors," although he does not specify which ones. (Doc. No. 1-1 at 11-12). Petitioner's barebones allegation is directly contradicted by the record, which shows that this Court made specific findings of fact to support its ruling after hearing from both sides and conducting its own independent review of the Rule 11 hearing. (Crim. Case No. 5:09-cr-25-RLV-DCK-1, Doc. No. 272 at 12-15). Accordingly, even if it were not procedurally defaulted, Petitioner's claim nevertheless fails.

**D. Petitioner's claim that this Court erred by failing to order a competency hearing.**

In his next claim, Petitioner contends that this Court erred by declining to order a competency hearing based on Petitioner's behavior in the various hearings during the criminal proceedings. Because Petitioner failed to pursue his claim on direct appeal and has not alleged cause, prejudice, or actual innocence, this claim is also procedurally defaulted. Moreover, even if not procedurally defaulted, Petitioner's claim is without merit. Under the applicable statute, either party may move for a hearing to determine the mental competency of a defendant at any point after the commencement of criminal proceedings. 18 U.S.C. § 4241(a). When presented with such a motion, the district court should order a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." Id. Under the applicable standard, a defendant is incompetent if he is "unable to understand the nature and consequences of the proceedings

against him or to assist properly in his defense." Id. Even in the absence of a motion by one of the parties, the court may order a competency hearing on its own motion if it has reasonable cause to believe that the defendant is incompetent. Id. Whether reasonable cause exists to justify a competency hearing is a matter "left to the discretion of the district court." United States v. Banks, 482 F.3d 733, 742 (4th Cir. 2007). Moreover, the Fourth Circuit has recognized that the pursuit of a "frivolous" or "ill-advised" legal strategy does not, in and of itself, provide reasonable cause to question a defendant's competency. Id. at 743.

Petitioner has not identified any record evidence suggesting that he did not understand the nature of the proceedings or that he was unable to assist in his defense due to some mental defect. In fact, when the Government suggested a competency hearing, the magistrate judge and Petitioner's attorney both stated, based on their interactions with and observations of Petitioner, that, despite his pursuit of "unusual legal theories," he appeared to understand the proceedings and was "competent" and "articulate." See (Crim. Case No. 5:09-cr-25-RLV-DCK-1, Doc. No. 233 at 4-5). Petitioner himself has conceded in a "Letter of Apology," written to this Court and submitted as an exhibit to the motion to vacate, that his actions were tactical, explaining that his "defense approach" was based on "bad information being spread throughout the county jails." See (Doc. No. 1-5: Letter). As the Fourth Circuit has recognized, however, the pursuit of an "ill-advised" legal strategy is not indicative of a lack of competency to proceed. See Banks, 482 F.3d at 742-43. Accordingly, even if it were not barred, Petitioner's claim fails.

**E. Petitioner's claim that the Government breached the plea agreement by declining to move for a downward departure.**

In his final claim, Petitioner contends that the Government breached the plea agreement by

declining to move for a downward departure. Courts review claims of prosecutorial misconduct "to determine whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 186 (4th Cir. 2002) (internal quotations omitted). To prove a claim of breach, a petitioner bears the burden of proving the existence of an agreement and the government's breach of that agreement. United States v. Snow, 234 F.3d 187, 189 & n.2 (4th Cir. 2000); see also United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996). Here, the plea agreement stated that the Government "may" file a motion for downward departure if, "in its sole discretion," it determined that Petitioner's assistance was substantial. (Crim. Case No. 5:09-cr-25-RLV-DCK-1, Doc. No. 93 at 8). Thus, the plea agreement did not obligate the Government to file a motion for downward departure. Moreover, the plea agreement also stated that a motion by Petitioner to withdraw his plea would constitute a breach of the agreement and would relieve the Government of its obligations. (Id. at 9). As such, by moving to withdraw his guilty plea, Petitioner breached the agreement, thereby relieving the Government of any obligations under the plea agreement. Thus, Petitioner's final claim is without merit.

## IV. CONCLUSION

For the reasons stated herein, the Court will deny and dismiss the § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and

 **DISMISSED**.

2.      Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court

declines to issue a certificate of appealability as Petitioner has not made a

substantial showing of the denial of a constitutional right.  28 U.S.C. §

2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003) (in order to satisfy

§ 2253(c), a petitioner must demonstrate that reasonable jurists would find the

district court's assessment of the constitutional claims debatable or wrong).

Signed: September 30, 2015

Richard L. Voorhees
United States District Judge